EFiled: May 27 2015 01:44PM EDT
Transaction ID 57297166
Case No. 7282-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

May 27, 2015

Jessica Zeldin, Esquire
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

Stephen C. Norman, Esquire
Ryan T. Costa, Esquire
Tyler J. Leavengood, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19801

P. Clarkson Collins, Jr., Esquire
Patricia A. Winston, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

Michael DeBaecke, Esquire
Stanley Tarr, Esquire
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801

Robert D. Goldberg, Esquire
Biggs & Battaglia
921 North Orange Street
Wilmington, DE 19801

Raymond J. DiCamillo, Esquire
Kevin M. Gallagher, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Elizabeth M. McGeever, Esquire
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19801

M. Duncan Grant, Esquire
James G. McMillan, III, Esquire
Pepper Hamilton LLP
1313 North Market Street
Wilmington, DE 19801

Re:   *In re Molycorp, Inc. Shareholder Derivative Litigation*
Consolidated C.A. No. 7282-VCN
Date Submitted:  January 16, 2015

Dear Counsel:

This is a dispute about whether a secondary stock offering at an unusually high price, demanded by private equity investors that together owned 44.1% of a corporation's stock and facilitated by directors they appointed, impermissibly allowed select shareholders to benefit to the detriment of the corporation. Complaints related to the sale of stock in June 2011 (albeit presenting different legal theories) were filed from as early as 2012, and Plaintiffs in this derivative action assert demand futility based on the composition of the board at the time of earlier-filed complaints. Although not without some questions regarding demand futility, the Court dismisses Plaintiffs' claims (for breach of fiduciary duties, aiding and abetting, and unjust enrichment) for failure to state a claim, in light of the investors' contractual right to sell and the absence of a demonstrable basis for recovery.

\* \* \* \* \*

Plaintiffs Resource Equities, G.P. ("Resource Equities") and Ira Gaines (individually and as trustee of the Paradise Wire & Cable Defined Benefit Plan Dated 11/1/84, "Gaines") are shareholders of Nominal Defendant Molycorp, Inc. ("Molycorp").[1] Molycorp is a publicly traded Delaware corporation "engaged in the production and sale of rare earth oxides in the western hemisphere."[2] Defendants fall into three categories: (1) TNA Moly Group LLC ("TNA"), Traxys North America, LLC ("Traxys"),[3] RCF Management LLC ("RCF"), and Pegasus

---

[1] Unless otherwise indicated, the facts have been drawn from the Second Amended Verified Consolidated Stockholders' Derivative Complaint ("SAC") and essential incorporated documents, namely the Registration Rights Agreement, Opening Br. in Supp. of Director Defs.' Mot. to Dismiss Second Am. Compl. ("DD OB") Ex. 2 ("RRA"), and the Stockholders Agreement. Aff. of Lynda J. Grant ("Grant Aff.") Ex. D ("SA"). On a motion to dismiss, the Court may consider, for "limited" purposes, documents that are "integral to a plaintiff's claim and incorporated in the complaint." *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995). The Court "may also take judicial notice of matters that are not subject to reasonable dispute." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006) (citing D.R.E. 201(b)). The analysis here considers Molycorp's stock prices, which both Plaintiffs and Defendants have asked the Court to observe, and earlier filings which assist the demand futility discussion.

[2] SAC ¶ 29.

[3] TNA was formed to hold Traxys's Molycorp stock. A Certificate of Cancellation for TNA was filed in February 2012. *See* Transmittal Aff. of Patricia A. Winston, Esq. ("Winston Opening Aff.") Ex. 3, July 14, 2014.

Capital Advisors, L.P. ("Pegasus," collectively, the Private Equity Investors ("PEIs")[4]); (2) Ross R. Bhappu ("Bhappu"), Mark A. Smith ("Smith") and his entity KMSMITH, LLC ("KMSMITH"), Charles R. Henry ("Henry"), Mark S. Kristoff ("Kristoff"), Jack E. Thompson ("Thompson"), Alec Machiels ("Machiels"), Brian T. Dolan ("Dolan"), and Russell D. Ball ("Ball," collectively, the "Director Defendants"); and (3) groups (1) and (2) above with the exception of Ball (the "Selling Defendants").

Defendants are linked in a number of ways.[5] At the time the SAC was filed, Pegasus indirectly controlled Traxys and TNA, and was a "shareholder partner[]"[6]

---

The Court does not reach the question of whether TNA has been properly dissolved. The Court sometimes refers to TNA and Traxys as "TNA" for convenience.

[4] The Court recognizes that the PEIs protest being characterized as a group. TNA and Traxys, RCF, and Pegasus have retained separate counsel and have filed separate briefs. The defined term is used for convenience rather than to acknowledge a control group.

Furthermore, except where the differences are material, the Court does not distinguish among the arguments in Defendants' eight briefs (or the Plaintiffs' two). Molycorp has joined in the Director Defendants' motion to dismiss and related briefs.

[5] The details are complicated, and not all facts relied on in the briefing were raised in the SAC. A high-level summary is provided for context. In light of the Court's decision *infra*, a fuller description of the complex relationship among the Defendants would not be material.

[6] SAC ¶ 38.

of the Traxys Group with RCF. Bhappu formed Molycorp's predecessor in 2008, in which the PEIs (among others) joined to acquire a rare earth element mine. In 2010, in preparation for Molycorp's initial public offering ("IPO"), "investors and insiders rolled up their assets into Molycorp."[7] The PEIs and KMSMITH also executed a Stockholders Agreement and a Registration Rights Agreement, both dated April 15, 2010.[8] Effective until the IPO, the Stockholders Agreement gave the PEIs the right to nominate members to the board (among other rights).[9] This power resulted in Bhappu, Dolan, Machiels, and Kristoff serving as partners and directors of multiple parties at the time of the June Offering. The Registration Rights Agreement secured the PEIs' rights to have Molycorp register their shares for a secondary offering. As of spring 2011, RCF held 23.4% of Molycorp's shares, Pegasus (and affiliates) held 13.4%, and TNA held 7.3%—collectively 44.1%.

In its IPO prospectus, Molycorp announced a vision including "build[ing] the largest, most advanced and efficient fully integrated [rare earth oxide]

---

[7] SAC ¶ 53.

[8] RRA 23-25; SA 34-36.

[9] The agreement generally provided that "[e]ach Director . . . shall serve solely in the discretion of the Stockholder that nominated such Director." SA § 9(d).

processing facility in the world."[10] Molycorp's July 2010 IPO, however, generated a "disappointing" $360.4 million.[11] Yet, rare earth element prices shot up after China, which controls the market, limited its exports in September 2010. The Defendants benefited from this price spike early on through a secondary offering of Molycorp stock in February 2011. Plaintiffs do not contest the February offering, although Molycorp did not share in the over $675 million ($50 per share) gross proceeds.[12] In March 2011, Molycorp had $492.5 million in cash, as compared to a capital budget of approximately $781 million through 2013.

By May, Molycorp knew that a $280 million loan guarantee from the Department of Energy ("DOE") would not come through as planned[13] and that financing and joint venture opportunities with Sumitomo Banking Corp.

---

[10] SAC ¶ 61 (first alteration in original) (internal quotation marks omitted). At the time, this project was expected to cost over $500 million dollars.

[11] SAC ¶ 63. Molycorp had wanted to raise $478 million.

[12] Defendants argue that Plaintiffs could not maintain such a claim because Molycorp's stock price rose after February. They also note that if the board had exercised its delay rights in February, it would not have been able to delay the June Offering without breaching the Registration Rights Agreement. Opening Br. of Defs. TNA Moly Group LLC and Traxys North America, LLC in Supp. of Their Mot. to Dismiss ("TNA OB") 3-4, 41. Plaintiffs clarify that they do not complain about the February offering because Molycorp's financial needs had not become dire at that point. Oral Arg. Defs.' Mot. to Dismiss ("Oral Arg. Tr.") 116.

[13] An October 18, 2010, article in *Forbes* suggested that the loan guarantee could help to make up for funds not generated by the IPO. SAC ¶ 65.

("Sumitomo") and Hitachi Metals, Ltd. ("Hitachi") were in danger. Rare earth element prices follow a "classic boom-bust cycle"[14] typical of (but more extreme than other) commodities prices, and the prices were not showing the same rate of growth. Some analysts had predicted "that market adjustment of [rare earth element] prices was inevitable."[15]

It was at this time when Defendants exercised the demand registration rights at the heart of this dispute. Section 2 of the Registration Rights Agreement provided the authority for the PEIs to demand priority registration of their shares:

> [T]he Corporation shall be required to include in such Registration Statement only such number of securities as is equal to the Underwriter's Maximum Number and the Corporation and the Requesting Holders shall participate in such offering in the following order of priority:
> (i) First, the Corporation shall be obligated and required to include in the Registration Statement the number of Registrable Securities that the Requesting Holders have requested to be included in the Registration Statement and that does not exceed the Underwriter's Maximum Number . . . .
> (ii) Second, the Corporation shall be entitled to include in such Registration Statement and underwriting that number of shares of Common Stock and/or other securities of the Corporation that it proposes to offer and sell for its own account or the account of any

---

[14] SAC ¶ 49.
[15] SAC ¶ 73.

other Person to the full extent of the remaining portion of the Underwriter's Maximum Number.[16]

This "Demand Registration" right was subject to certain conditions, such as Molycorp's ability to delay action for up to ninety days based on a good faith judgment of the board and its counsel that "it would be materially detrimental to the Corporation or its stockholders for such Registration Statement either to become effective or to remain effective."[17] The PEIs could not demand registration "for one hundred twenty (120) days immediately following the effective date of a Registration Statement filed pursuant to the prior exercise of any Holder's [S-1] registration rights" and six months of a primary offering.[18] Furthermore, they were limited in the number of S-1 registration requests they could make.[19] Of course, the Registration Rights Agreement did not permit any fiduciary to breach its fiduciary duties.

---

[16] RRA § 2(i). The Underwriter's Maximum Number refers to "the number of securities that can be sold without adversely affecting the price, timing, distribution or sale of securities in the offering." RRA § 2(i).

[17] RRA § 2(d). Defendants also point out that the Registration Rights Agreement required Molycorp to use "reasonable best efforts to file (within ninety (90) days after such request has been given) with the SEC a Registration Statement." RRA § 2(a).

[18] RRA § 2(e).

[19] RRA § 2(b).

The Registration Rights Agreement contemplates other types of registrations as well. Notably, there is the provision whereby Molycorp can elect to register and sell shares for its own account but, to the extent that the Underwriter's Maximum Number has not been reached, must include additional shares requested by covered shareholders (a "Company Registration").[20] A Company Registration does not trigger explicit frequency restrictions or delay provisions beyond certain notice periods.[21]

The PEIs invoked their right to a Demand Registration, and Molycorp filed a registration statement on May 24, 2011.[22] In the offering that followed (the "June Offering"), Smith and KMSMITH, Kristoff, Henry, Thompson,[23] Pegasus, TNA,

---

[20] RRA § 3(c)(ii).

[21] TNA argues that the prospectus for the IPO contradicts Plaintiffs' explanation of priority in Company Registrations. *See* Reply Br. of Defs. TNA Moly Group LLC and Traxys North America, LLC in Supp. of Their Mot. to Dismiss ("TNA RB") 22 n.16. At this stage, the Court examines the language appearing in the Registration Rights Agreement and notes that even accepting a reading friendly to Plaintiffs does not change its conclusion.

[22] Plaintiffs observe that the Director Defendants agreed that they and Molycorp would not raise funds through stock (or securities convertible into stock) for ninety days after the June Offering. Pls.' Br. in Opp'n to Private Equity Investors' Mots. to Dismiss Second Am. Compl. ("Pls.' PEI Opp'n Br.") 4. The SAC does not incorporate an underwriting agreement (or a demand letter), but these are not material to the Court's assumptions about control.

[23] The SAC does not focus on how the individual sellers participated.

and RCF sold at $51 per share.[24]   Altogether, the Selling Defendants received

approximately $575 million (gross) in the June Offering.   The sale allegedly

saturated the market for Molycorp stock and caused media concern that insiders

were "abandon[ing]" the company.[25]  Molycorp, on the other hand, conducted a

private offering of convertible notes on June 15, 2011.   The offering raised

$223 million, but Molycorp's cash on hand was still more than $100 million short

of its core operating budget through 2013.  Molycorp was unable to implement its

strategy to increase production beginning in late 2010, missing additional profits

from the spike in rare earth element prices.[26]

Within a few months of the June Offering, prices for rare earth elements

(and Molycorp stock) fell significantly.[27]  By September, Molycorp had a capital

and operating budget of around $950 million and $562 million cash on hand.  In

February 2012, Molycorp arranged a private sale of 12.5 million shares for

---

[24] Additionally, Bhappu, Dolan, and Machiels participated "indirectly" through the PEIs.  SAC ¶¶ 84-85.  The SAC does not discuss the Underwriter's Maximum Number in great detail.   Plaintiffs suggest that the maximum numbers were "apparently" the amounts sold in February and June.  *See* Pls.' PEI Opp'n Br. 22.

[25] SAC ¶ 87 (internal quotation marks omitted).

[26] *Compare* SAC ¶ 64 (quoting from the IPO prospectus), *with* SAC ¶ 100 (quoting an October 2011 press release).

[27] Defendants emphasize that Molycorp's price "remained strong" until mid-September.  TNA OB 18; *see also* SAC ¶ 20.

$390 million.  At $51 per share, Molycorp would have earned approximately $248 million more.  Molycorp raised another $532 million in August 2012 by selling stock (at $10 per share) and convertible senior notes.[28]

Gaines filed a complaint in February 2012,[29] and the first amended complaint in the consolidated action was filed on August 21, 2012.[30]  The consolidated complaint "implicate[d] whether there were material misstatements and improper trading in Molycorp stock by certain Defendants."[31]  Due to a pending federal securities class action, the Court stayed the consolidated action on May 15, 2013.[32]  Resource Equities filed its first complaint on July 23, 2013,

---

[28] Plaintiffs ask the Court to take judicial notice of Molycorp's trading price of less than $2.00 per share (as of September 2014).  Grant Aff. Ex. A, at 1.

[29] Interestingly, Gaines's initial complaint alleged that Molycorp had raised too much money: "Given this price run up, the Company has raised hundreds of millions of dollars through the IPO, two Secondary Offerings, and a convertible preferred offering, among other things, providing it with money to engage in a shopping spree . . . ."  Verified Deriv. S'holder Compl. ¶ 62, Feb. 24, 2012.

[30] The Court focuses on the milestones important for demand purposes.  For more background on the procedural history, see *In re Molycorp, Inc. Shareholder Derivative Litigation*, 2014 WL 1891384 (Del. Ch. May 12, 2014).

Defendants have raised concerns that one of Plaintiffs' attorneys engaged in this litigation as both plaintiff and counsel.  The involvement was not simultaneous.

[31] *Id.* at *2.

[32] Federal securities fraud complaints have been dismissed in the Southern District of New York (with prejudice) and the District of Colorado (with leave to amend).

alleging three counts: breach of fiduciary duties by the Director Defendants, breach of fiduciary duties and aiding and abetting by the PEIs, and unjust enrichment by the Selling Defendants.[33] That complaint was consolidated into the original action; it was never an operative complaint.

Plaintiffs focused on the current dispute when they filed a motion to lift the stay and to file the SAC on October 9, 2013. In their motion papers, Plaintiffs noted that "the United States Securities and Exchange Commission (the 'SEC') staff determined that it would not recommend any formal action against the Company" and that the instant allegations "do not substantially overlap with the securities case."[34] Finding that the "Delaware corporate law claim is not raised in the Federal Securities Action, . . . . [n]or does this theory appear to have been raised in any of the derivative actions currently stayed,"[35] the Court granted the motion. The SAC became operative on May 15, 2014.

---

Letter from Raymond J. DiCamillo, Esq., Apr. 1, 2015. The Court's decision in May 2014 took notice of the Colorado proceedings.

[33] S'holders' Verified Deriv. Compl. ¶¶ 78-92, *Res. Equities, G.P. v. Smith*, C.A. No. 8744 (Del. Ch. July 23, 2013).

[34] Pls.' Mot. to Lift Stay and for Leave to File an Am. Compl. 2.

[35] *In re Molycorp*, 2014 WL 1891384, at *6.

Five directors remained on the board at all relevant times: Kristoff, Machiels, Dolan, Henry, and Ball. Again, in June 2011, there were eight members on the board, with four individually selling in the June Offering (Smith, Kristoff, Henry, and Thompson) and three others holding significant positions within at least one of the PEIs (Bhappu, Machiels, and Dolan). By October 9, 2013 (filing of the motion for leave to amend), Smith and Thompson were no longer on the board. Instead, Michael Schwarzkopf, John Graell, and Constantine E. Karayannopoulos had been appointed. Karayannopoulos was Molycorp's Interim CEO and President until December 2013. Finally, by May 15, 2014 (filing of the SAC), Bhappu had left the board and Geoffrey R. Bedford and James J. Jackson assumed positions.[36]

\* \* \* \* \*

The SAC asserts three counts: (1) that the Director Defendants breached fiduciary duties by favoring the PEIs' and their own interests over Molycorp's; (2) that the PEIs breached their fiduciary duties as a control group and aided and abetted the Director Defendants' breaches of fiduciary duties; and (3) that the

---

[36] DD OB 17-18. Plaintiffs focused on earlier filings and did not contest the independence of Graell, Schwarzkopf, Bedford, and Jackson in the SAC or answering briefs.

Selling Defendants were unjustly enriched through reaping profits knowing that Molycorp could not stop the sale. More specifically, Plaintiffs complain about the board's "failing to delay the June Offering and allowing Molycorp to hold an offering first, or at least allocating a substantial portion of the June 2011 Offering to Molycorp, as doing so would have diminished the Selling Defendants' profits or even prevented them from making a second offering."[37] The PEIs are alleged to have "closed Molycorp out of the equity markets at a time when Molycorp was in dire need of an equity infusion."[38] The Selling Defendants are faulted for selling for profit, knowing that "Molycorp could not prevent this unfair and inequitable conduct."[39]

Defendants have moved to dismiss the SAC for failure to make demand pursuant to Court of Chancery Rule 23.1 and for failure to state a claim pursuant to Court of Chancery Rule 12(b)(6). The Court resolves this dispute on the Rule 12(b)(6) arguments without deciding whether demand would have been futile, the PEIs were a control group, or the Director Defendants were interested in the June Offering. As relevant, Defendants contend that the Registration Rights

---

[37] SAC ¶ 89.
[38] SAC ¶ 81.
[39] SAC ¶ 131.

Agreement secured the PEIs' right to sell (not to mention protection against Plaintiffs' desired intervention), the common law allows shareholders to deal with their shares in good faith, and the PEIs cannot be charged with "clairvoyance."[40] Thus, the PEIs did not usurp a corporate opportunity or engage in wrongful conduct. Defendants add that, in light of the above rights, Plaintiffs have not shown how the board acted unreasonably. They point out that Molycorp's (unpredictable) stock price remained strong for months after June 2011. Claims for aiding and abetting against the PEIs allegedly fail because fiduciaries cannot aid and abet another fiduciary, Plaintiffs did not plead knowing participation in wrongful conduct, and there is no underlying breach. Finally, Defendants attack the unjust enrichment claims as covered by the Registration Rights Agreement and duplicative of deficient fiduciary duty claims.

In response, Plaintiffs emphasize entire fairness, claiming that they meet the threshold because of a conflicted board, the PEIs' control and actions, and Defendants' exclusive profits. Given the above, Plaintiffs continue, the Court cannot dismiss their claims under a Rule 12(b)(6) standard. Particularly, their

---

[40] Opening Br. in Supp. of Def. RCF Management's Mot. to Dismiss Second Am. Compl. 18.

interpretation of the Registration Rights Agreement permits Molycorp to interfere with the PEIs' registration demand and, fundamentally, never allowed the Director Defendants or the PEIs to breach fiduciary duties. Plaintiffs clarify that their aiding and abetting claims are in the alternative and that the ties between the directors and the PEIs allow the Court to infer knowing participation. Finally, they argue that their unjust enrichment claims should not be dismissed because their "claims are rooted in equity . . . and are not based upon a violation of the [Registration Rights Agreement]."[41] They submit that the contract does not completely govern the parties' relationship and that their unjust enrichment and fiduciary duty claims survive in parallel.

Defendants, in reply, criticize Plaintiffs for relying on speculation, misreading the Registration Rights Agreement, and asking the Court to draw unreasonable conclusions. They argue that to survive the motions to dismiss the fiduciary duty claims (and to trigger the entire fairness standard), Plaintiffs' pleadings must support some unfair or conflicted action.[42] In fact, they contend

---

[41] Pls.' Br. in Opp'n to Director Defs.' Mot. to Dismiss Second Am. Compl. ("Pls.' DD Opp'n Br.") 46.

[42] Reply Br. in Further Supp. of Director Defs.' Mot. to Dismiss Second Am. Compl. 22-24 & nn.28, 30.

that Molycorp's board did not have the right to interfere with the PEIs' priority—if not under the explicit language of the detrimental condition provision then under an implied covenant of good faith. They add that exercise of valid contract rights does not establish knowing participation in the breach of a fiduciary duty and that Defendants' actions fell squarely within the parameters of the Registration Rights Agreement, leaving no room for unjust enrichment claims.

\* \* \* \* \*

## A. *A Word on Demand Futility*

To promote judicial economy, the Court focuses on the merits of the fiduciary duty, aiding and abetting, and unjust enrichment claims. Both sides have presented thoughtful arguments on the issue of demand, but the Court grants the motions to dismiss without resolving the thorny issues of legal standard and the relevant board. For one, regardless of whether the test articulated in *Aronson v. Lewis*[43] or *Rales v. Blasband*[44] is applied, Plaintiffs have an argument that demand

---

[43] 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[44] 634 A.2d 927, 934 (Del. 1993). The SAC reads more like a charge of inaction, but Plaintiffs discuss "affirmative decision[s]" and the *Aronson* test in their briefing. Pls.' DD Opp'n Br. 29.

is excused based on the composition of the board at all relevant filings until the May 2014 filing. Before the SAC took effect, a majority of the board members had either sold stock in the June Offering or held high level positions with selling shareholders.[45] It would seem unfair to allow boards to frustrate demand excusal while this Court takes time to decide a motion,[46] and earlier complaints more than alluded to the same underlying events.[47] Ultimately, however, the Court need not

---

Plaintiffs elaborated during oral argument that "there has to have been a decision not to try to sell . . . . [because] when [Molycorp] went public, it didn't raise as much money as it wanted to." Oral Arg. Tr. 84; *see also id.* at 90 ("The decision was to raise $400 million the worst possible way . . . at the whim of the third part[ies].").

A breach of fiduciary duties can be found for an act, as well as a failure to act. *See Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."). As discussed *infra*, the Court need not resolve this dispute.

[45] Kristoff and Henry had sold stock personally in June 2011; Bhappu, Machiels, and Dolan served concurrently as partners of a PEI.

[46] Given that exactly half of the directors serving in May 2014 had served since the first Gaines complaint, the parties debate whether the analysis in *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006), applies. If it did apply, it would likely track the merits analysis that the Court performs *infra*. Again, it is not necessary for the Court to resolve this question.

[47] For example, the first amended complaint contained allegations that "the Director Defendants could have delayed the June 2011 Offering" and "could have attempted an equity offering . . . in advance of the June 2011 Offering," Verified Consolidated Am. S'holder Deriv. Compl. ("FAC") ¶ 100, Aug. 21, 2012, as well as that the Director Defendants "cho[se] to side with the Controlling Shareholders

resolve these issues because the SAC fails to state a claim upon which Plaintiffs can recover. Thus, the Court simply assumes that a majority of the directors serving in October 2013 had disqualifying interests by reason of personal gains or fiduciary relationships with PEIs and that demand would be excused.[48]

B. *The Relevant Standards*

On a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6), the Court takes as true the well-pleaded facts in the complaint and draws reasonable

---

to ensure that Defendants . . . had primary access to the equity market." FAC ¶ 101. Count I identified breaches of duties by "participating in and profiting from the February and June 2011 Offerings," FAC ¶ 215, but the harms were couched in terms of securities fraud. *See* FAC ¶ 216. Resource Equities' first complaint, though never operative, leveled allegations similar to those in the SAC.

[48] The Court's assumption that demand would have been futile does not mean that the SAC necessarily "contains sufficient facts to state a cognizable claim." *See McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008). Similarly, an assumption that the Director Defendants had competing interests relating to the June Offering does not suffice to state a claim for breach of fiduciary duties, as explained *infra*. Plaintiffs suggest that claims survived in *Carsanaro v. Bloodhound Technologies, Inc.*, 65 A.3d 618 (Del. Ch. 2013), "where at least half of the board was alleged to have not been independent and disinterested in setting the terms of several rounds of preferred stock financing because it was reasonably conceivable that most of the purportedly conflicted directors were also fiduciaries for affiliated funds that participated . . . ." Pls.' DD Opp'n Br. 43. The key is the combination of the interests and the reasonably conceivable allegations of wrongful conduct. *See Carsanaro*, 65 A.3d at 639, 640 (noting allegations of acts that permit "a reasonable inference of unfairness").

inferences in the light most favorable to the non-moving party.[49]  The Court

dismisses the complaint only where "the plaintiff would not be entitled to recover

under any reasonably conceivable set of circumstances."[50]  Nonetheless, the Court

need not accept "conclusory assertions unsupported by specific factual

allegations,"[51] and "a claim may be dismissed if allegations in the complaint or in

the exhibits incorporated into the complaint effectively negate the claim as a matter

of law."[52]

One heated dispute that occupies a substantial portion of the parties' papers

is the proper standard of review for the fiduciary duty claims.  Plaintiffs argue that

the conduct of both the Director Defendants and the PEIs should be subject to

entire fairness review.  Defendants submit that the Director Defendants are entitled

to the protection of the business judgment rule and that, to the extent there is a

loyalty claim against the PEIs, it should be evaluated under the corporate

opportunity doctrine.  Distinguishing among standards of review is an important

---

[49] *E.g.*, *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[50] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[51] *Allied Capital Corp.*, 910 A.2d at 1030.

[52] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

(and frequently a dispositive) exercise. Regardless of the level of scrutiny, however, a plaintiff must make allegations that support the basic elements of a claim. The "classic" duty of loyalty claim involves "preferring the adverse self-interest of the fiduciary or of a related person to the interest of the corporation."[53] It is because its decision turns on the failure to state a claim that the Court does not reach the issue of whether a more exacting standard of review applies.

C. *The Fiduciary Duty Claims*

Plaintiffs' basic argument is that, at a time when Molycorp needed funding, other sources were risky at best, and everyone knew that prices would fall eventually, Defendants sold their own stock and shut Molycorp out of a sale. Defendants assert that Plaintiffs have not alleged any wrongful conduct.[54] They draw support from the Registration Rights Agreement, pleadings about funding in the SAC, and unpredictable stock prices.

---

[53] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006). The SAC hints at a breach of the duty of good faith, but those claims were not developed in subsequent briefing and oral argument. To establish a breach of the duty of good faith, a plaintiff must at least show that defendants engaged in conduct "qualitatively more culpable than gross negligence." *Id.*

[54] Defendants make other arguments, particularly those challenging control and conflicts, but the Court focuses on the sufficiency of the SAC. The Court assumes, but does not decide, that the PEIs owed fiduciary duties.

To survive a motion to dismiss, a complaint must show that there is a reasonably conceivable set of facts under which the plaintiff can recover. A fiduciary is not strictly liable for all injuries; a breach of fiduciary duty claim requires some cognizable wrong.[55] A number of cases have explored the distinction between permissible and wrongful actions by fiduciaries. To begin, this

---

[55] In other words, a fiduciary is not presumed to be liable for every grievance asserted against her. *See, e.g.*, *Weinberger v. UOP, Inc.*, 457 A.2d 701, 703 (Del. 1983) (stating general agreement with the principle that "even though the ultimate burden of proof is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair, it is first the burden of the plaintiff attacking the merger to demonstrate some basis for invoking the fairness obligation"); *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 762 (Del. Ch. 2006) (dismissing a complaint against a controlling shareholder (and its controller) for sale of the company to a competitor because, "[a]t the very least, a plaintiff seeking to state a claim must plead facts that indicate that the controller knew there was a risk that the buyer was a looter or otherwise intended to extract illegal rents from the subsidiary").

Although the Court does not decide whether a majority of Molycorp's directors were conflicted, it notes that Plaintiffs have not rebutted the presumptions of the business judgment rule as to Ball. Being appointed by a powerful or controlling shareholder does not make one conflicted. *Aronson*, 473 A.2d at 816. The Delaware Supreme Court recently clarified that "applying the entire fairness standard against interested parties does not relieve plaintiffs seeking damages of the obligation to plead non-exculpated claims against each of the defendant directors." *In re Cornerstone Therapeutics Inc., S'holder Litig.*, -- A.3d --, 2015 WL 2394045, at *6 (Del. May 14, 2015). Molycorp's charter includes a Section 102(b)(7) provision. DD OB Ex. 1 art. VIII. Therefore, even if claims were to remain against interested parties, claims against Ball would need to be tested for sufficient pleadings of non-exculpated conduct.

Court has held that it is not enough to observe that a controller had interests that conflicted with the minority shareholders' interests—to state a claim, one must allege that the controller used her power in an unfair manner.[56] Of course, the law does not require a controller to sacrifice every benefit of her investment because she is interested in the result.[57] In *Goodman v. Futrovsky*,[58] for example, the Delaware Supreme Court rejected an argument that the lower court should have considered all of the plaintiff's claims before approving a settlement. The defendants owned two businesses, established a contractual relationship between the two, and, over a decade later, publicly sold stock for one. The conflict had

---

[56] *See, e.g.*, *Monroe Cnty. Empls.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) ("Transactions between a controlling shareholder and the company are not *per se* invalid under Delaware law. Such transactions are perfectly acceptable if they are entirely fair, and so plaintiff must allege facts that demonstrate a lack of fairness." (footnote omitted)).

[57] *See, e.g.*, *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *9 (Del. Ch. Sept. 27, 2013) ("[E]ven a controlling shareholder is not required to give up legal rights that it clearly possesses . . . ." (alteration and internal quotation marks omitted)); *cf. Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *5 (Del. Ch. Aug. 25, 2006) ("[The defendant] is alleged to have taken advantage of its contractual rights for its own purposes. Without more, that is not sufficient to allege that [the defendant] is a 'controlling shareholder' bound by fiduciary obligations.").

[58] 213 A.2d 899 (Del. 1965).

been disclosed in the offering prospectus and later public filings.[59]  The plaintiff's first claim alleged that one of the companies was "solely a device to divert profits" from the other company to its controllers, and that claim of fraud on the company was voluntarily abandoned as "without merit."[60]  Settlement negotiations proceeded on the second claim—that the arrangement served a "business function" but that the "profits had become excessive."[61]  In agreeing that the first theory lacked merit, the Court reasoned that the controllers' conduct "was [their] privilege, and the buying public may not complain of that decision as long as it was not misled."[62]

Case law on wrongful conduct by directors is also well-developed. Appointment by a powerful shareholder does not automatically render a director's decisions suspect.[63]  Nor is it wrong for a director to buy or sell company shares, without more.[64]  If such conduct were actionable, "directors of every Delaware corporation would be faced with the ever-present specter of suit for breach of their

---

[59] *Id.* at 901.

[60] *Id.* at 900.

[61] *Id.*

[62] *Id.* at 902.

[63] *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014).

[64] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 974 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004).

duty of loyalty if they sold stock in the company on whose Board they sit."[65]  Even when a form of heightened scrutiny applies, a plaintiff cannot prevail by advancing unreasonable inferences or by making conclusory statements and suggesting that it is the defendant's burden to prove them wrong.  In particular, the Court has declined to find liability based on allegations that, judging from hindsight, directors could have done more to protect shareholders.[66]  It also cannot be the law that a director breaches her fiduciary duties by merely failing to predict stock price movements accurately.[67]

Plaintiffs allege, as culpable conduct, that the that the PEIs (1) appointed representatives to the board,[68] (2) "functioned as a *de facto* group of controlling

---

[65] *Id.*

[66] *See, e.g.*, *Dias v. Purches*, 2012 WL 4503174, at *8 (Del. Ch. Oct. 1, 2012) (making a fee award based on a meritorious disclosure claim but not on a "fruitless" claim that directors violated duties under *Revlon* because they failed to secure a price collar—and the price of the merger consideration later fell).

[67] *Cf. Noerr v. Greenwood*, 1997 WL 419633, at *4-5 (Del. Ch. July 16, 1997) (discussing federal and state authority and rejecting "'fraud by hindsight'" allegations). The *Noerr* court, for example, declined to adopt "a more flexible standard, under which it may infer from a rapid increase (or decrease) in stock price that follows a contrary representation as to the stock's value, that the fiduciary knew or should have known that their disclosures were false." *Id.* at *5.

[68] SAC ¶ 67.

stockholders" through ownership and "common goals,"[69] (3) invoked their registration rights, and (4) "closed Molycorp out of the equity markets,"[70] or (5) knowingly "assisted in [the Director Defendants' breach of fiduciary duties], encouraged them, and benefitted."[71] The Director Defendants are alleged to have (1) "resolved the issue [of selling priority] by putting the interests of the Controlling and Selling Stockholders ahead of those of the Company,"[72] (2) "authorized a second massive capital raise,"[73] (3) elected "to complete a private offering of Convertible Notes" for Molycorp,[74] and (4) knowingly exposed Molycorp to financial risks.[75] The SAC provides varying degrees of fact-based support for these allegations.

Taking the well-pleaded facts in the light most favorable to Plaintiffs, there is no question that the Selling Defendants, and not Molycorp, benefited from the June Offering. The PEIs believed that they would profit by demanding registration in May 2011. All Defendants knew that each share the Selling Defendants sold

---

[69] SAC ¶ 70.

[70] SAC ¶ 81.

[71] SAC ¶ 127.

[72] SAC ¶ 17; *see also* SAC ¶ 89.

[73] SAC ¶ 17.

[74] *See* SAC ¶ 92.

[75] *E.g.*, SAC ¶¶ 9, 76, 92.

meant one less share for Molycorp to sell and that Molycorp's stock price would eventually fall. Defendants also knew that arrangements with the DOE, Sumitomo, and Hitachi had not come through (and possibly would never). Molycorp did not have cash on hand in 2011 to satisfy its projections through 2013.[76] It had ambitious plans and desired additional funds. Unable to ramp up its mining efforts by late 2010, it missed out on sales of rare earth elements at the temporarily high prices. Molycorp needed "at least $100 million more" to achieve its mining goals from as early as late 2010[77] and was unable to do so until late 2011.[78]

A closer observation of the pleadings, however, does not support the main conclusions the Court is asked to draw. Critically, the SAC does not allege that the Registration Rights Agreement was invalid.[79] This fact, combined with a lack of

---

[76] In March 2011, Molycorp had $492.5 million, and in June 2011, presumably, Molycorp had $680 million, as compared to its nearly $800 million operating budget through 2013. SAC ¶¶ 12, 92. The other budget numbers postdate the decision-making window for the June Offering. *See*, *e.g.*, SAC ¶¶ 21, 99, 101. As such, they do not help the Court to infer that Defendants acted culpably.

[77] *See* SAC ¶ 79; *see also* SAC ¶ 64.

[78] SAC ¶ 100.

[79] This is not an instance where problematic contract rights have been superseded by fiduciary duty concerns. *See*, *e.g.*, *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 840-43 (Del. Ch. 2011). Plaintiffs do not question the Registration

reason to believe that the PEIs knew when the rare earth element bubble would burst, defeats the fiduciary duty claims against the PEIs. The PEIs were major investors in Molycorp and bargained for certain rights before the IPO. Contending that the PEIs exercised rights that benefited themselves but were fairly extracted and disclosed in public filings, as in *Goodman*, does not itself state a claim that the PEIs took advantage of Molycorp and its minority shareholders.[80] A finding otherwise could discourage would-be investors from funding start-ups for fear that their investment value will not be preserved despite disclosed, carefully negotiated agreements. Even assuming that the PEIs controlled their board appointees, Plaintiffs would need to plead that the PEIs had done something wrong to state a breach of fiduciary duties.

Plaintiffs suggest that the PEIs "exclud[ed] Molycorp from the equity markets at a crucial point."[81] The Court infers that the relevant timeframe extended from May 2011 through September 2011. The pleadings, in contrast, do

---

Rights Agreement. They do question whether various Defendants should have intervened to delay or defeat a contractually-conferred right to sell.

[80] In *Goodman*, there was an additional viable claim that profits from the negotiated agreement had become excessive. The well-pleaded complaint does not allege that the Defendants here had control over Molycorp's stock price or knew when the boom phase would end.

[81] SAC ¶ 126.

not provide support for allegations that Molycorp had a pressing need to fund its business during those few months and that other financing avenues (for example, a convertible note offering) were closed going forward.[82]  Maybe discovery would yield a factual basis for Plaintiffs' suppositions about the Defendants' assessment of the path of the price of Molycorp's stock as a function of time.  Emails might prove informative, but speculation of that sort should not accompany a decision on a motion to dismiss.  The Court must base its decision on the facts as set forth by the Plaintiffs in the SAC, not conclusory statements.  It simply is not a wrong to sell stock knowing that "'a pin lies in wait for every bubble,'"[83] before a company with other opportunities decides to sell its own stock.

Similar reasoning explains why Plaintiffs have not stated a claim against the Director Defendants.  Again, the Registration Rights Agreement informs the context in which Defendants were acting and cannot be ignored.  In their opposition, Plaintiffs raise the argument that the express language of the contract supports the Director Defendants' duty to have sold stock for Molycorp.  Under

---

[82] For further discussion, see *infra* text accompanying notes 87-88.

[83] *See* Pls.' PEI Opp'n Br. 3 n.5 (quoting Warren Buffett).  To the extent that there are fiduciary duty claims against the Selling Defendants as such, the same reasoning about speculation would seem to apply.  *See also* DD OB 51 (citing cases).

Plaintiffs' reading, the Director Defendants could have secured the benefits of the June Offering for Molycorp by conducting a Company Registration "at any time it needed to raise cash"[84] or by delaying the Demand Registration (and conducting a Company Registration in the meantime). True, the Director Defendants could have conducted a Company Registration as soon as they learned that the BOE loan guarantee was in jeopardy. Defendants argue, however, that once the PEIs requested a Demand Registration, a Company Registration designed to preclude that offering would not have been in good faith (whether as an express or implied obligation).[85] With respect to delaying a Demand Registration (assuming that the detrimental condition provision extends beyond mere filing), the board would have needed to certify that a detrimental condition existed "in the good faith judgment of [itself] and its counsel."[86]

Perhaps the Court is to infer that Molycorp's directors had a duty to conduct a Company Registration or to interfere with the PEIs' contractual rights.[87] This

---

[84] Pls.' PEI Opp'n Br. 41.

[85] *See* TNA RB 25-26.

[86] RRA § 2(d). The Court does not resolve the parties' debate over the meaning of the detrimental condition provision as it is not material to its conclusion.

[87] Alternatively, perhaps the board needed to adjust the allocation of the June Offering. *See* Pls.' PEI Opp'n Br. 42 n.32 (offering one possibility).

argument conceivably could succeed if the factual allegations (and reasonable inferences) establish a reason to take such action. Plaintiffs seem to suggest that a cash crunch provided that reason. They allege that the amount of cash Molycorp had in 2011 was less than the amount Molycorp projected it needed through 2013. They note expert forecasts, slowing price growth, frustrated financing opportunities, and two public statements suggesting that production plans were delayed from 2010 to 2011. Yet they also state that Molycorp raised $233 million in a June 2011 note offering, and the latter of the two statements announced that Molycorp would meet its production goal "three months earlier than previously planned."[88] Moreover, the SAC gives no reason to infer that, as of May 2011, Defendants knew that Molycorp could not make another successful offering (perhaps ninety days after the June Offering). A developing company almost certainly will have budget issues—it is not reasonable to infer fault for every decision that does not raise money. Simply put, the well-pleaded facts that Molycorp's IPO did not raise as much money as expected and that the DOE, Sumitomo, and Hitachi arrangements were in jeopardy do not state a reasonably conceivable claim that the Director Defendants needed to violate the PEIs'

---

[88] SAC ¶ 100 (internal quotation marks omitted).

expectations (or conduct a Company Registration whenever Molycorp desired more funding).

There is also an argument that the Director Defendants rightfully could have (and needed to have) delayed the Demand Registration because of a detrimental condition. The parties debate whether a cash shortfall triggers the materially detrimental condition provision; it is not suggested that any other materially detrimental condition existed at the time. Regardless of how the provision is interpreted, the SAC does not provide any allegations about a good faith decision made by the board and its counsel (or even the lack thereof). The Court, on its own, does not find a reasonably conceivable case for invoking the provision, particularly when the SAC does not explain why Molycorp promptly needed funds through an equity offering and what decisions were (or were not) made by the board and its counsel. The factual allegations, as elaborated *supra*, actually contradict a finding of a need for a delay.

The strongest argument against finding a reasonably conceivable wrong, though, is that there are no allegations that the Director Defendants knew that the

market would rise and fall as dramatically as it did, when it did.[89] A director is not liable for failing to predict the movement of stock prices, and a stockholder is generally allowed to sell her shares. The PEIs exercised contractual rights that they had secured on April 15, 2010. Molycorp's stock price rose with the price of rare earth elements, largely tracking a boom-bust cycle and political events. The stock price did not fall substantially until September 2011—months after two large secondary sales.[90] The Court declines to charge a director with knowing (or at least having sufficient reason to know), based on pleadings of a cyclical market and an unusual political event, that prices will decrease, within a narrow time frame, below the level needed to raise funds that her company needs.

In conclusion, Plaintiffs' theories of liability fail because the Court cannot accept conclusory statements, engage in speculation, or rely on hindsight. Plaintiffs do not identify particular board meetings, resolutions, or authorizations

---

[89] The discussion about the limits of speculation, *supra* text accompanying notes 81-83, applies here as well.

[90] While hindsight does not demand any legal conclusion, it shows that the secondary offerings did not significantly affect the price of Molycorp's stock—the price remained strong for almost ninety days after the June Offering. *See* Winston Opening Aff. Ex. 5. Also, had Molycorp delayed the Demand Registration for a period just short of ninety days, it is possible that the Selling Defendants still would have earned high profits that could have accrued to Molycorp. *See* TNA OB 4.

about participating in or delaying an offering. The Court does not mean to suggest that a plaintiff must plead particular facts to survive a motion to dismiss, but it does not know when decisions were made, who made those decisions, and how such decisions were made—assuming that there were board acts. The SAC even indicates that Molycorp raised over $200 million in June 2011 through a convertible note offering. The Registration Rights Agreement, facts contradicting a cash crunch, and the human inability to predict the future preclude a conceivable finding that Defendants violated their fiduciary duties. Accordingly, because the primary fiduciary duty claims fail, any secondary aiding and abetting claims would also fail.[91]

D. *The Unjust Enrichment Claims*

Plaintiffs' final count is for unjust enrichment against the Selling Defendants. A claim for unjust enrichment requires Plaintiffs to show "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and

---

[91] The elements of an aiding and abetting claim are: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede*, 780 A.2d at 1096 (omission in original) (internal quotation marks omitted). Thus, regardless of whether the PEIs were fiduciaries, there is no viable claim.

impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[92] Unjust enrichment claims fail where a validly negotiated contract governs the contested matter, although the Court can be wary of granting a motion to dismiss when it is not clear that the contract covers the entire dispute.[93] Furthermore, where a breach of fiduciary duty claim based on the same facts and circumstances fails, the Court often dismisses the corresponding unjust enrichment claim.[94]

The analysis here is simple because the Registration Rights Agreement has not been challenged as an unfair or invalid contract. Plaintiffs argue that they are not grounding their claims in a breach of contract, but the validly negotiated contract rights and the failure to allege culpable conduct (by the directors or the PEIs) defeat claims that the Selling Defendants lacked justification for their gains in the June Offering.[95] Unable to establish this critical element, Plaintiffs cannot succeed on their unjust enrichment claims.

---

[92] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *16-17 (Del. Ch. Dec. 22, 2010).

[93] *See, e.g., id.* at *16.

[94] *Frank v. Elgamal*, 2014 WL 957550, at *31.

[95] *Cf. Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) ("Just as the plaintiffs have failed on the merits of their breach of contract claim, they have failed to

＊ ＊ ＊ ＊ ＊

For the reasons above, Defendants' motions to dismiss are granted.[96]

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:   Register in Chancery-K

---

prove that the Directors[] unjustly benefited from the pre-transaction redemption, in contravention of . . . the fundamental principles of justice or equity and good conscience." (internal quotation marks omitted)).   Those not parties to the Registration Rights Agreement would not seem to have the benefit of its justification to sell, even if there was a close relationship with a signatory. Nonetheless, the SAC fails to charge the Selling Defendants with knowledge of (or reason to know) how Molycorp's price would move.  They are not guarantors and, as discussed in the fiduciary duty analysis, Plaintiffs have not provided a basis to infer wrongful conduct from the fact of a sale.

[96] The motions to dismiss are granted with prejudice as to the named Plaintiffs.  To be clear, this decision does not affect the rights of shareholder Paul Temkin, who pursued an action under 8 *Del. C.* § 220, *Temkin v. Molycorp, Inc.*, C.A. No. 8240, and whose Rule 23.1 demand on the Molycorp board remains unresolved.  *See* Letter from Brian D. Long, Esq., Jan. 15, 2015.